**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| Laura A. Hall, | § | |
| Plaintiff, | § | |
| | § | CASE NO. 4:23-cv-337 |
| | § | |
| v. | § | |
| | § | |
| Experian Information Solutions, Inc.; | § | |
| TransUnion, LLC; Westlake Services, | § | |
| LLC; and DOES 1 through 100 inclusive, | § | |
| | § | |
| Defendants. | § | |

COMES NOW Plaintiff **LAURA A. HALL** ("Plaintiff"), an individual, based on information and belief, to allege as follows:

## INTRODUCTION

1.     This case arises under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681s-2(b), 1681e(b), 1681i(a)(2)(A), 1681i(a)(4), and 1681i(a)(5)(A). Plaintiff seeks redress for the unlawful and deceptive practices committed by the Defendants in connection with their inaccurate, misleading, or incomplete reporting of Plaintiff's debt reaffirmed in her Chapter 7 bankruptcy.

2.     Here, Defendant Westlake Services, LLC ("Westlake") is inaccurately reporting Plaintiff's account to Experian and TransUnion.

3.     The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system and unfair credit reporting methods undermine the public confidence that is essential to the continued functioning of the banking system.

4.     A pervasive and fundamental misunderstanding presently thrives in the United States regarding the long-term impact that filing a consumer bankruptcy has on the consumer's creditworthiness. Specifically, consumers tend to believe that since a bankruptcy can be reported on their credit report for ten (10) years, their creditworthiness will be ruined for the same length of time. This is not true.

5.      The *majority* of consumer debtors file a consumer bankruptcy to *raise* their FICO Score and remedy their poor creditworthiness.

6.      In fact, it is possible for consumer debtors to obtain a 700 FICO Score as soon as twelve (12) months from filing a consumer bankruptcy (Chapter 7 or Chapter 13).

7.      Creditors and lending institutions are aware of the misconception that filing a consumer bankruptcy destroys the consumer's creditworthiness of ten (10) years; however, to perpetrate this bankruptcy myth, creditors intentionally and routinely ignore industry standards for accurately reporting bankruptcies, as well as the debts included in those bankruptcies, to keep consumers' credit scores low and their interest rates high.

8.      Creditors know that deviating from recognized credit reporting standards will make it difficult for consumers to raise their credit scores and improve their creditworthiness.

9.      This was not the intent of Congress when it enacted the Fair Credit Reporting Act and the Bankruptcy Abuse Prevention and Consumer Protection Act.

## JURISDICTION & VENUE

10.      Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

11.      This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, 1367, and 15 U.S.C. § 1681.

12.      This venue is proper pursuant to 28 U.S.C. § 1391(b)(1).

13.      Plaintiff alleges that, for purposes of establishing residency under 28 U.S.C. § 1391(b)(1), each named Defendant conducts sufficient business within the forum state and this Court has personal jurisdiction over Defendants under 28 U.S.C. §§ 1391(c)(2) and 1391(d).

## GENERAL ALLEGATIONS

14.      Plaintiff alleges that the Westlake account covers a motor vehicle that was reaffirmed in her Chapter 7 bankruptcy. Subsequent to the reaffirmation, Plaintiff made all payments and has continued to do so until present.

15.      Plaintiff alleges that Westlake is incorrectly reporting Plaintiff's account to Experian as closed and without a balance, and that the debt was included in or discharged through bankruptcy. Further, Westlake is incompletely and inaccurately reporting payment history even though Plaintiff has made all payments since the reaffirmation. Westlake is also reporting a "N" for negative for the month of June 2022 even though the account was properly paid in June 2022.

Plaintiff alleges the Westlake tradeline on her Experian report shows her Chapter 7 bankruptcy but fails to list the debt as reaffirmed.

16.     Plaintiff alleges that Westlake is incorrectly reporting Plaintiff's account to TransUnion as closed and with an incorrect balance, and with incomplete and inaccurate payment history even though Plaintiff has made all payments since the reaffirmation. Plaintiff alleges the Westlake tradeline on her TransUnion report shows her Chapter 7 bankruptcy but fails to list the debt as reaffirmed.

17.     Plaintiff alleges that if a data furnisher decides to report an account, the FCRA requires complete and accurate reporting; therefore, a data furnisher cannot pick and choose which portions of the account to report. If a data furnisher reports an account, then it should report all portions of that account in a manner which complies with the maximum accuracy and completeness standard of the FCRA.

18.     Plaintiff alleges that each and every Defendant is familiar with the FCRA requirements and credit reporting industry standards, and subscribes thereto.

19.     Plaintiff alleges that each and every Defendant understands that deviation from the FCRA requirements or credit reporting industry standards can, and often does, result in the denial of credit, higher interest rates, and prompts a negative inference that would not be drawn if the data were reported in accordance with the recognized standards.

20.     Plaintiff alleges that all of Defendants' actions alleged herein were committed knowingly, intentionally, and in reckless disregard of the unambiguous meaning of the FCRA, regulatory guidelines on accurate reporting, and credit reporting industry standards to purposefully undermine her ability to repair her Credit Score.

21.     In the alternative, Plaintiff alleges that each and every Defendants' actions were the result of negligent policies, procedures, and an objectively unreasonable interpretation of the FCRA, all which inevitably led to inaccurate, misleading, or incomplete credit reporting.

## FACTUAL BACKGROUND

22.     Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.     FICO, Inc.**

23.     FICO is a leading analytics software company with its principal headquarters in San Jose, California. FICO has over 130 patents related to their analytics and decision management

technology and regularly uses mathematical algorithms to predict consumer behavior, including credit risk.

24.     The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent (90%) of lending decisions.[1]

25.     A FICO Score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

26.     Base FICO Scores range from 300 to 850, while industry specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

27.     Different lenders use different versions of FICO Scores when evaluating a consumer's creditworthiness.

28.     There are twenty-eight (28) FICO Scores that are commonly used by lenders.

29.     A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies ("CRAs").

30.     The three largest CRAs are Experian Information Solutions, Inc. ("Experian"); Equifax Information Services, LLC ("Equifax"); and TransUnion, LLC ("TransUnion").

31.     FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models, or algorithms, are based on the premise that the information provided by the CRAs is accurate and complies with both the FCRA requirements and credit reporting industry standards.

32.     There are five (5) key factors that a FICO Score considers: (1) payment history; (2) amount of debt; (3) length of credit history; (4) new credit; and (5) credit mix.

33.     Each of the five (5) factors is weighted differently by FICO.

34.     In other words, thirty-five percent (35%) of a consumer's FICO Score relates to payment history, thirty percent (30%) relates to the amount of debt, fifteen percent (15%) relates to the length of credit history, ten percent (10%) relates to new credit, and the final ten percent (10%) relates to a consumer's credit mix, which is the different types of debts reported.

---

[1] While there are other credit scoring models, it is well established that FICO Score is by far the most widely used by lenders, employers, insurance companies, and lessors. *See https://www.myfico.com* (a website created and operated by Fair Isaac Corporation ("FICO"), "the company that invented the FICO credit score").

35.     Payment history refers to whether a consumer has paid their bills in the past, on time, late, or missed payments. The more severe, recent, or frequent the late payment information, the greater the impact on a FICO Score. Public record items, such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

36.     In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.

37.     Once a delinquent account has been remedied, the longer the account stays current the more a consumer's FICO Score should increase.

38.     FICO Scores are entirely dependent upon information provided by data furnishers ("DFs"), such as banks and other financial institutions, to CRAs.

39.     The FICO scoring formula treats both Chapter 7 and Chapter 13 Bankruptcies similarly in terms of their impact on one's FICO Score. Specifically, both Chapters have the same level of severity with respect to their FICO Score and FICO uses the filing date, under both Chapters, to determine how long ago the bankruptcy took place.

40.     A FICO Score is a summary of your credit report. In simple terms, the FICO Score is calculated by taking the five (5) factors (payment history, amount of debt, length of credit history, new credit, and credit mix) for each account in a credit report and calculating a three digit number for lenders to review. "When you apply for credit, lenders need a fast and consistent way to decide whether or not to loan you money." *See* https://www.myfico.com/credit-education/what-is-a-fico-score. If a lender or employer did look past the FICO Score into a consumer's reports, chances are they either do not understand the tradeline meanings themselves, or, if they do and realize something appears incorrect, they are incapable of recalculating the complex mathematical algorithms in a FICO Score to take the found error into consideration. Therefore, most lenders and employers do not review individual accounts, just a consumer's FICO Score (or average of FICO Scores) in order to make "quicker decisions". *See id*.

41.    Some lenders also use internal scoring models. In these instances, the lenders attempt to produce their own "FICO Score" based upon their internal credit scorecard models. These models are, similar to FICO, based upon algorithms, business rules, codes, etc. and take information reported in the credit reports and assign weights to them in order to assess risk and make determinations as to consumer's creditworthiness. FICO Scores and the scores based off internal models being collectively referred to as "Credit Score".

**B.    e-OSCAR**

42.    e-OSCAR is the web-based system developed by Experian, Equifax, TransUnion, and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.

43.    When a consumer sends a dispute letter to a CRA, the CRA then sends an automated credit dispute verification ("ACDV") via e-OSCAR to the appropriate DF.

44.    The ACDV contains codes next to certain data fields associated with a credit file.

45.    When a data furnisher reports on a consumer's account as part of its regular reporting, it sends a regular monthly transmission to each CRA.

46.    When a data furnisher reports on a consumer's account outside of its regular monthly transmission, it sends an automated universal dataform ("AUD") to each CRA.

47.    For clarification, an AUD or other regular transmission is sent when the data furnisher initiates reporting on a consumer's account (e.g., opening an account, updating the account each month, closing an account, etc.), whereas an ACDV is how a data furnisher receives a dispute request from the CRAs and how it updates reporting back to the CRAs after its investigation of the matter.

**C.    Bankruptcy Credit Reporting Industry Standards & Consumer Information Indicator**

48.    When a consumer files bankruptcy, certain credit reporting industry standards exist.

49.    Certain data is regularly expected and calculated by FICO when determining a consumer's creditworthiness.

50.    The Consumer Information Indicator ("CII") is a critical field that indicates a special condition that applies to a specific consumer.

51.    It is the credit reporting industry standard to report a very specific CII upon the filing of a consumer bankruptcy.

52.     The CII "R" denotes reaffirmation of a debt. In addition, completely reaffirmed debts should report appropriate Account Status and account information as it applies going forward.

53.     The CII field is a critical field for consumers as it directly relates and impacts a consumer's creditworthiness.

54.     The lack of a CII reported makes it appear that a consumer has not addressed outstanding debt obligations through the bankruptcy process.

55.     Furthermore, the lack of a CII reported suggests that creditors are free to collect against a consumer as an individual, or that no stay exists to prevent in personam collection activity.

56.     Failure to report the correct CII indicator will prompt those making credit decisions to draw a more negative inference than if the appropriate CII indicator were reported.

57.     The FCRA permits a bankruptcy to be reported for ten (10) years from the date the bankruptcy was filed.

58.     A consumer's FICO Score is directly related to the date on which a petition is filed and acknowledged.

59.     The bankruptcy's impact on a consumer's FICO Score lessens with the passage of time.

60.     Accordingly, the failure to reference the bankruptcy filing (CII field) and/or the correct petition date results in a lower FICO Score, which in turn causes credit decision makers to draw a more negative inference regarding a consumer's creditworthiness.

**D.      Plaintiff's Debt was Reaffirmed in her Bankruptcy**

61.     Plaintiff filed a voluntary petition for Chapter 7 bankruptcy on June 16, 2022, in order to repair her creditworthiness and Credit Score.

62.     On or about July 22, 2022, Plaintiff executed a reaffirmation agreement, which matched the original terms of the prior agreement, and was filed with the court on August 10, 2022 ("Reaffirmation Agreement").

63.     Plaintiff's bankruptcy was discharged on September 13, 2022.

E.      **Plaintiff's Credit Report Contains Inaccurate and Adverse Tradelines, which Plaintiff Disputed to no Avail**

64.      On September 21, 2022, Plaintiff ordered an Experian credit report, an Equifax credit report, and a TransUnion credit report to ensure proper reporting by her creditors (the "September 21 Credit Reports").

65.      Plaintiff noticed adverse tradelines in her September 21 Credit Reports, reporting inaccurate, misleading, or incomplete information that did not comply with the FCRA standards.

66.      Plaintiff then disputed the inaccurate tradelines regarding the account with Westlake via certified mail to Experian, Equifax, and TransUnion on or about November 3, 2022 (the "Dispute Letters").

67.      Plaintiff's Dispute Letters specifically put Westlake on notice that the account should not be listed as closed or included in bankruptcy since the account was reaffirmed, and that the account should be listed as open, with a balance, and with accurate payment history.

68.      Plaintiff's Dispute Letters included a copy of the signed Reaffirmation Agreement along with copies of recent payments to support her contention that the account was not discharged and she was continuing to make payments.

69.      Plaintiff's Dispute Letters also detailed what was perceived to be problematic about the Westlake account reporting, addressing each tradeline individually.

70.      Plaintiff requested that any derogatory reporting be updated to ensure accuracy and completeness of the account as required by the FCRA.

71.      Plaintiff is informed and believes that Experian, Equifax, and TransUnion each received Plaintiff's Dispute Letters and, in response, sent Plaintiff's dispute to Westlake, as the data furnisher, via an ACDV through e-OSCAR.

72.      On December 13, 2022, Plaintiff ordered a second Experian credit report, Equifax credit report, and TransUnion credit report, to determine if the reporting on the account was updated.

a.  **Inaccuracy – Westlake**

73.      Despite actual knowledge, Westlake continued to report Plaintiff's account, beginning in 176738XX, to Experian as "Closed", with a payment status of "Debt included in or discharged through Bankruptcy 7, 11, or 12", without a balance, and with incomplete and inaccurate payment history including an "N" for negative in June of 2022. This is patently incorrect

as this account was reaffirmed, is currently open with a balance, payments were made (including in June of 2022), and it was not discharged in her bankruptcy.

74.    Despite actual knowledge, Westlake continued to report Plaintiff's account, beginning in 176738XX, to TransUnion as "Closed", with a $0 balance, and a comment of "Chapter 7 Bankruptcy". This is patently incorrect as this account was reaffirmed, is currently open with a balance, payments were made, and it was not discharged in her bankruptcy.

75.    Reporting a reaffirmed debt as closed or discharged in bankruptcy is patently incorrect. Reporting no payment history when payments have been made is patently incorrect. In addition, these inaccurate and incomplete tradelines are misleading in a way that can adversely affect credit decisions.

76.    Plaintiff alleges that Westlake did not investigate whether the account was reaffirmed, or whether the Plaintiff had been making payments since filing the Reaffirmation Agreement.

77.    Experian, Equifax, and TransUnion each provided notice to Westlake that Plaintiff was disputing the inaccurate and misleading information, but Westlake failed to conduct a reasonable investigation of the information as required by the FCRA.

78.    Based on Plaintiff's disputes, the provided payment verification, the Reaffirmation Agreement (which Westlake signed and filed with the bankruptcy court), along with its own internal records, Westlake should have known that Plaintiff's account was not closed or discharged due to the Reaffirmation Agreement and that Plaintiff has maintained a positive payment history which was not being properly reported.

79.    The most basic investigation would include a simple review of internal documentation on the account compared to its reporting in order to determine if it complies with the maximum possible accuracy and completeness standard of the FCRA.

80.    Plaintiff alleges that Westlake did not review if its reporting complied with the FCRA or industry standards for credit reporting, the dispute letters it received from Experian, Equifax, and TransUnion, or its own internal records concerning Plaintiff's account.

81.    If Westlake reviewed such standards and records, Westlake would have seen that its reporting was not in compliance and was therefore inaccurate or incomplete. At the very least, the investigation would reveal that payments were being made on the account, and therefore, those payments should be reported.

82.    Westlake should have reported the CII Code as "R" and updated the account to accurately report all the payments made on the account.

83.    By continuing to report Plaintiff's account as described hereinabove, it incorrectly appears to third parties viewing Plaintiff's credit reports that Plaintiff has not properly made payments and that the account was included and discharged in her bankruptcy. This makes Westlake's reporting misleading.

84.    Further, as this inaccurate reporting is being used to calculate Plaintiff's Credit Score, the credit score alone being what most lenders use to determine Plaintiff's creditworthiness, it is misleading in such a way as to adversely affect credit decisions.

85.    A discharged debt is treated far more derogatorily by a potential lender than one which was reaffirmed and reflects a consumer's ability to make payments month after month, year after year.

86.    As payment history makes up thirty-five percent (35%) of a consumer's credit score, and as most lenders approve or deny credit based on a consumer's credit score (as opposed to poring through each tradeline of every account listed to obtain context), the incorrect payment history reported by Westlake is lowering Plaintiff's Credit Score, which adversely affects her ability to obtain credit.

87.    Further, even if a lender did look through the tradelines, based upon Westlake's reporting, it appears as if the Plaintiff has not made payments on this account and that it was closed, or discharged in bankruptcy; all of which are inaccurate.

88.    The lack of investigation and reporting of inaccurate and incomplete information by Westlake is unreasonable.

**F.    Damages**

89.    Plaintiff pulled her credit reports at issue at a cost for access to the reports, after the dispute process, specifically for the sole purpose of verifying that the inaccuracies were fixed.

90.    As a result of the incorrect reporting, Plaintiff has incurred out-of-pocket expenses, and has also suffered emotional harm, physical sickness, and excessive stress resulting in doubt as to the effectiveness of the Fair Credit Reporting Act and the power of this Court to preserve and perpetuate Plaintiff's rights to accurate credit reporting as intended by Congress.

91.    Plaintiff has been denied credit, and is unable to rebuild her credit based on the inaccurate reporting by Westlake. Further, Plaintiff's diminished creditworthiness, resulting from

Westlake's inaccurate reporting, has caused her to abandon her intentions to apply for certain credit.

92.    Westlake's actions, as alleged herein, are in direct violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b).

**FIRST CAUSE OF ACTION**

**(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681e(b))**

**(Against Defendants and Does 1-100)**

93.    Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    Experian and TransUnion (collectively the "CRA Defendants") Each Failed to Assure Credit Reporting Accuracy**

94.    Experian violated 15 U.S.C. § 1681e(b) by failing to establish and/or follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and the credit files it published and maintained concerning Plaintiff.

95.    TransUnion violated 15 U.S.C. § 1681e(b) by failing to establish and/or follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and the credit files it published and maintained concerning Plaintiff.

96.    Had Experian maintained reasonable procedures to assure maximum accuracy, Experian would never have allowed Westlake to report the Plaintiff's account as described herein.

97.    Experian knew, or should have known, (1) that the Westlake account was not closed or discharged in bankruptcy based on Plaintiff's dispute and attached documents, and (2) that the Westlake account was reaffirmed and should be reported as such. Further, Experian knew, or should have known, that this inaccurate and incomplete reporting does not reflect *maximum possible accuracy and completeness* as required by the FCRA.

98.    Had TransUnion maintained reasonable procedures to assure maximum accuracy, TransUnion would never have allowed Westlake to report the Plaintiff's account as described herein.

99.    TransUnion knew, or should have known, (1) that the Westlake account was not closed based on Plaintiff's dispute and attached documents, and (2) that the Westlake account was reaffirmed and should be reported as such. Further, TransUnion knew, or should have known, that this inaccurate and incomplete reporting does not reflect *maximum possible accuracy and completeness* as required by the FCRA.

100.    Congress specifically recognized the "elaborate mechanism developed for investigating and evaluating credit worthiness, credit standing, credit capacity, character, and general reputation of consumers." *Nayab v. Capital One Bank (USA), NA*, 942 F. 3d 480, 492 (9th Cir. 2019). The investigation and evaluation of Plaintiff's credit worthiness, credit standing, credit capacity, character and general reputation as a consumer are all damaged by the inaccurate reporting Experian and TransUnion independently allowed.

101.    As a result of Experian and TransUnion's independent violations of 15 U.S.C. § 1681e(b), Plaintiff has suffered actual damages, including but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

**B.    Willful Violations**

102.    The CRA Defendants' violations, as described herein, were willful; specifically, the CRA Defendants have intentionally and purposefully set up a system where inaccuracies are not only probable, but inevitable.

103.    The CRA Defendants regularly, as a policy, ignore disputes by consumers and fail to perform even a basic investigation regarding the disputes. Additionally, the CRA Defendants regularly fail to forward disputes to data furnishers, thereby frustrating the entire dispute process.

104.    To the extent the CRA Defendants do send consumer disputes, the CRA Defendants send these disputes to employees who do not live within the continental United States to hide or subvert a consumer's liability to confront the individual(s) directly responsible for approving accurate reporting.

105.    The CRA Defendants' respective employees receive little to no training concerning how to accurately report consumer debt.

106.    Instead, the CRA Defendants' respective employees are instructed to parrot whatever information a data furnisher provides regardless of whether the information is accurate.

107.    The CRA Defendants' respective employees are regularly expected to review and approve over ninety (90) disputes per day, rendering less than five (5) minutes to review, investigate, and respond to each dispute received.

108.    The CRA Defendants have intentionally set up this system in order to undermine, hide, and otherwise frustrate consumers' ability to properly dispute and correct credit reports.

109.     As a result of the CRA Defendants' independent violations of 15 U.S.C. § 1681e(b), Plaintiff has suffered actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

110.     Experian's violations were willful, rendering it individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

111.     TransUnion's violations were willful, rendering it individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

112.     In the alternative, Experian was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

113.     In the alternative, TransUnion was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

114.     Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from Experian in an amount to be determined by this Court pursuant to 15 U.S.C. § 1681n and § 1681o.

115.     Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from TransUnion in an amount to be determined by this Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## SECOND CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. §§ 1681s-2(b) and 1681i(a)(1))

### (Against Defendants and Does 1-100)

116.     Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.     Westlake Failed to Reinvestigate Following Plaintiff's Disputes**

117.     Pursuant to 15 U.S.C. § 1681s-2(b), data furnishers are prohibited from providing any information relating to a consumer to any CRA if it knows, or has reasonable cause to believe, that the information is inaccurate or misleading and requires data furnishers to update and/or correct inaccurate information after a CRA notifies it of a consumer dispute.

118.    Westlake sent an AUD or monthly transmission to Experian reporting Plaintiff's account status as closed, the account as included in or discharged through bankruptcy, and without a balance. Additionally, the AUD or monthly transmission to Experian reported inaccurate and incomplete payment history, including a "N" for June 2022.

119.    Westlake sent an AUD or monthly transmission to TransUnion reporting Plaintiff's account status as closed and without a balance. Additionally, the AUD or monthly transmission to TransUnion reported inaccurate and incomplete payment history.

120.    Even after Plaintiff and Westlake executed the Reaffirmation Agreement and it was filed with the court, Westlake continued to report the debt as described herein.

121.    After execution of the Reaffirmation Agreement, Westlake did not report the debt as "reaffirmed", but instead continued to report it as closed, included in or discharged through bankruptcy, without a balance, and with inaccurate and incomplete payment history to Experian.

122.    After execution of the Reaffirmation Agreement, Westlake did not report the debt as "reaffirmed", but instead continued to report it closed, without a balance, with bankruptcy notations, and with inaccurate and incomplete payment history to TransUnion.

123.    After execution of the Reaffirmation Agreement, Plaintiff was making payments, yet Westlake was misreporting those payments to Experian and TransUnion.

124.    After receiving the Dispute Letters, Westlake verified and re-reported inaccurate account information via ACDV to Experian, including reporting the account as closed, without a balance, a CII of E (account discharged in chapter 7 bankruptcy), with incomplete payment history, with an inaccurate "N" for June 2022, and without notation of the reaffirmation.

125.    After receiving the Dispute Letters, Westlake verified and re-reported inaccurate account information via ACDV to TransUnion, including reporting the account as closed, without balance, notation of the Chapter 7 bankruptcy, and without notation of the reaffirmation.

126.    After receiving the Dispute Letters, Westlake did not correct the payment history on the Experian or TransUnion credit reports. Instead, Westlake verified and re-reported the inaccurate and incomplete payment history via ACDV to Experian and TransUnion.

127.    Once the account was reaffirmed, the account should have been reported to reflect the current liability on the account, current ongoing payment terms, and actual payment history. Not doing so makes the reporting patently incorrect and very likely to mislead a credit reviewer of the consumer's performance and liability on the debt.

128.    Westlake violated 15 U.S.C. § 1681s-2(b) by either failing to conduct an investigation or failing to conduct a reasonable investigation, and re-reporting misleading and inaccurate account information.

129.    Equifax, Experian and TransUnion each provided notice to Westlake that Plaintiff was disputing the inaccurate and misleading information; however, Westlake failed to conduct a reasonable investigation as required by the FCRA.

130.    Based on Plaintiff's disputes, along with a review of its own internal records, Westlake should have known its account was reaffirmed and being paid. Further, Westlake should have reported the full payment history as it has actual knowledge of the payments made from the Reaffirmation Agreement until present.

131.    Since Westlake has already decided to report the account, as evidenced by it showing up on Plaintiff's credit reports, once it received the Dispute Letters, it had a duty to review all relevant information, and update any incorrect or inaccurate information to each of the CRAs.

132.    Inaccurate information includes not only the information reported, such as reporting a debt as discharged or closed when it was reaffirmed and is open, but also for omissions that render the reported information misleading, such as not reporting payments being made.

133.    Reporting an account which was reaffirmed with positive payment history as if it were discharged in bankruptcy and wholly without payment history is patently incorrect.

134.    Discharged debts are much more detrimental to a credit score than a reaffirmed debt, paid on time, and in good standing. In addition, this inaccurate reporting also adversely affects credit decisions. This inaccurately reported account is being considered when calculating Plaintiff's Credit Score. Most lenders, employers, and other individuals who access a consumer's credit report approve or deny credit or employment based upon the reported credit score and do not take the time to look through each tradeline of every account listed to obtain context. Therefore, Westlake's reporting as described herein has a direct adverse effect on Plaintiff's Credit Score and her ability to rebuild her Credit Score and obtain new credit.

135.    As a result of Westlake's violations of 15 U.S.C. § 1681s-2(b), Plaintiff has suffered actual damages, including but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

136.    The lack of investigation by Westlake as required by the FCRA, is unreasonable.

**B.    Willful Violations**

137.    Plaintiff alleges that Westlake has reported based upon objectively unreasonable interpretations of the FCRA standards of credit reporting and regulatory guidelines on how to accurately report under the FCRA.

138.    Plaintiff further alleges that Westlake has not properly trained those directly investigating disputes on FCRA requirements or credit reporting industry standards and, as such, has developed reckless policies and procedures.

139.    Plaintiff alleges that rather than train its employees on accurate credit reporting, FCRA requirements, and industry standards, Westlake's employees tasked with reviewing disputes are expected to confirm the information being reported as "accurate" instead of investigating the reported information.

140.    As Plaintiff executed the Reaffirmation Agreement, she retain personal liability on the loan, and it was not closed or discharged in her bankruptcy. Westlake had actual knowledge of the bankruptcy and Reaffirmation Agreement (which it executed and filed with the bankruptcy court), along with Plaintiff's intent to retain her motor vehicle and continue to pay her debt. All of this evidence, taken together, establishes Westlake's willfulness in its inaccurate and incomplete reporting.

141.    In the alternative, Westlake was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

**C.    The CRA Defendants Each Failed to Reinvestigate the Disputed Information in violation of 15 U.S.C. § 1681i(a)(1)**

142.    Pursuant to 15 U.S.C. § 1681i(a)(1), Experian was required to conduct a reasonable investigation and to delete any information that was not accurate after receiving notice of Plaintiff's dispute regarding the Westlake account.

143.    Pursuant to 15 U.S.C. § 1681i(a)(1), TransUnion was required to conduct a reasonable investigation and to delete any information that was not accurate after receiving notice of Plaintiff's dispute regarding the Westlake account.

144.    Thus, the CRA Defendants each failed to conduct a reasonable investigation and correct the misleading and/or inaccurate statements on the account within the statutory time frame.

145.    The CRA Defendants are not passive entities bound to report whatever information a data furnisher provides.

146.    Plaintiff alleges the CRA Defendants are readily familiar with the FCRA requirements and credit reporting industry standards.

147.    Based on the foregoing, Plaintiff alleges that the CRA Defendants can, and do, suppress inaccurate information from being reported when data furnishers provide inaccurate information.

148.    The CRA Defendants can and do instruct data furnishers on how to properly report certain accounts from time to time upon request from a data furnisher.

149.    Experian failed to conduct a reasonable investigation because any basic investigation would have uncovered that Westlake was not reporting the account at issue correctly.

150.    Had Experian conducted a proper investigation it could have updated the account to report as reaffirmed, open, and with a balance to indicate that payments were being made on the account. Further, Experian could have updated the payment history of the account (as payment history was provided with the Dispute Letters) to indicate that payments were being made on the account. However, Experian continued to report the account as described herein.

151.    Experian, therefore, did not conduct even the most basic investigation regarding the requirements set forth in the FCRA or credit reporting industry standards, otherwise the aforementioned would have been uncovered.

152.    TransUnion failed to conduct a reasonable investigation because any basic investigation would have uncovered that Westlake was not reporting the account at issue correctly.

153.    Had TransUnion conducted a proper investigation it could have updated the account to report as reaffirmed, open, and with a balance to indicate that payments were being made on the account. Further, TransUnion could have updated the payment history of the account (as payment history was provided with the Dispute Letters) to indicate that payments were being made on the account. However, TransUnion continued to report the account as described herein.

154.    TransUnion, therefore, did not conduct even the most basic investigation regarding the requirements set forth in the FCRA or credit reporting industry standards, otherwise the aforementioned would have been uncovered.

155.    In the alternative, Plaintiff alleges that Experian failed to send an ACDV to Westlake to confirm accurate reporting on its account. Despite receiving the Dispute Letters providing notice of the inaccuracies, Experian failed to delete or correct the tradeline or conduct an investigation.

156. In the alternative, Plaintiff alleges that TransUnion failed to send an ACDV to Westlake to confirm accurate reporting on its account. Despite receiving the Dispute Letters providing notice of the inaccuracies, TransUnion failed to delete or correct the tradeline or conduct an investigation.

157. In the alternative, if the CRA Defendants deemed the Dispute Letters "frivolous or irrelevant" under 15 U.S.C. § 1681i(a)(3), the CRA Defendants each failed to notify Plaintiff of such determination as required by 15 U.S.C. § 1681i(a)(3)(B). As Plaintiff received such notice from the CRA Defendants, Plaintiff alleges the CRA Defendants each deemed the Dispute Letters valid, and thus triggered its obligations under 15 U.S.C. § 1681i(a)(1) and (2)(A), for which they each independently failed to comply.

### THIRD CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(4))

### (Against Defendants and Does 1-100)

158. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A. The CRA Defendants Each Failed to Review and Consider all Relevant Information**

159. The CRA Defendants each independently violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff.

160. The CRA Defendant's independent violations of 15 U.S.C. § 1681i(a)(4) have caused Plaintiff to suffer actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B. Willful Violations**

161. The CRA Defendant's independent violations were willful, rendering each individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

162. In the alternative, the CRA Defendants were each negligent in failing to review and consider all relevant information Plaintiff submitted, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

163. Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from each CRA Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## FOURTH CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(5)(A))

### (Against Defendants and Does 1-100)

164.    Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    The CRA Defendants Each Failed to Delete Disputed and Inaccurate Information**

165.    The CRA Defendants each independently violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from Plaintiff's credit file or modify the item of information upon a lawful reinvestigation.

166.    The CRA Defendant's independent violations of 15 U.S.C. § 1681i(a)(5)(A) have resulted in Plaintiff suffering actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.    Willful Violations**

167.    The CRA Defendant's independent violations were willful, rendering each individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

168.    In the alternative, the CRA Defendants were negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

169.    Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from each CRA Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## PRAYER FOR RELIEF

170.    WHEREFORE, Plaintiff prays for judgment as follows:

a.    For preliminary and permanent injunctive relief to stop Defendants from engaging in the conduct described above;

b.    Award statutory and actual damages pursuant to 15 U.S.C. § 1681n;

c.    Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n;

d.    Award attorneys' fees and costs of suit incurred herein pursuant to 15 U.S.C. §§ 1681n and 1681o;

e.  For determination by the Court that Defendant's policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, *et seq*.; and

f.  For determination by the Court that Defendant's policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.

Respectfully submitted,

**SCHUMACHER LANE PLLC**

Dated: January 31, 2023

*/s/ Kyle Schumacher*
Kyle Schumacher
Attorneys for Plaintiff

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands trial of this matter by jury.

**SCHUMACHER LANE PLLC**

Dated: January 31, 2023

*/s/ Kyle Schumacher*
Kyle Schumacher
Attorneys for Plaintiff